**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____ :
                                  :
THE RESIDENCES AT BAY POINT       :
CONDOMINIUM ASSOCIATION, INC.,    :
                                  :
             Plaintiff,           :
                                  :     Civil Action No. 13-02380 (FLW)(LHG)
      v.                          :
                                  :          **OPINION**
THE STANDARD FIRE INSURANCE       :
COMPANY, *doing business as*      :
TRAVELERS INDEMNITY AND           :
AFFILIATES, and CHERNOFF          :
DIAMOND & CO, LLC,                :
                                  :
             Defendants.          :
_____ :


**WOLFSON, United States District Judge:**


        Before the Court is a Motion for Summary Judgment by Defendant Standard Fire

Insurance Company ("Standard"), pursuant to Federal Rule of Civil Procedure 56, to dismiss

with prejudice the Federal breach of contract, New Jersey state consumer fraud, and New Jersey

state negligence claims of the Residences at Bay Point Condominium Association ("Plaintiff")

arising from the 2013 reformation of four (4) Standard Flood Insurance Policies ("SFIP"s) issued

by Standard as part of the National Flood Insurance Program ("NFIP").


        For the reasons that follow, this Court finds (i) that the reformation of two of Plaintiff's

four SFIPs was mandated by federal law, Plaintiff's breach of contract claim based upon those

two policies is dismissed with prejudice, and judgment is entered for Standard regarding those

two policies; (ii) that Plaintiff has introduced new arguments in briefing, not contained within the

Complaint, which Standard agrees may present genuine issues of material fact precluding summary judgment on Plaintiff's breach of contract claim for the other two of Plaintiff's four policies, and, accordingly, Plaintiff's breach of contract claim based upon those two policies is dismissed without prejudice with leave given to Plaintiff to file an Amended Complaint within 20 days; and (iii) Plaintiff's state law claims are preempted by Federal Emergency Management Agency ("FEMA") regulations promulgated under the National Flood Insurance Act of 1968 ("NFIA"), as amended, and are dismissed.

I. Background of the National Flood Insurance Program

Congress passed the NFIA to "limit the damage caused by flood disasters through prevention and protective measures," namely through the creation of a comprehensive, federally-run system of flood insurance. *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 165 (3d Cir. 1998). The NFIA entrusted FEMA with the administration of the NFIP and funded the Program through the National Flood Insurance Fund, located in the United States Treasury and overseen by FEMA. *Id.* at 165 n. 2. The NFIA further authorized FEMA to "prescribe regulations establishing the general method or methods by which proved and approved claims for losses may be adjusted and paid for any damage to or loss of property which is covered by insurance." 42 U.S.C. § 4019. The resulting regulatory scheme, promulgated by FEMA, can be found in 44 C.F.R. §§ 61.1-78.14. Because the NFIP is a completely federally funded and administered program, states have no regulatory control over the NFIP's operations. *Linder & Assocs. Inc. v. Aetna Cas. & Sur. Co.*, 166 F.3d 547, 550 (3d Cir. 1999) ("It is well settled that federal common law governs the interpretation of [NFIP policies]. Accordingly, neither the statutory nor

decisional law of any particular state is applicable to the case at bar. . . . [W]e interpret the [policy] in accordance with its plain, unambiguous meaning, remaining cognizant that its interpretation should be uniform throughout the country and that coverage should not vary from state to state.")(quotations omitted).

Pursuant to another part of the NFIA, 42 U.S.C. § 4081(a), FEMA created the "Write-Your-Own" ("WYO") Program whereby SFIPs may be issued by private insurance companies like Standard ("WYO companies"). Though FEMA may issue SFIPs directly, "more than 90% are written by WYO companies. These private insurers may act as 'fiscal agents of the United States,' 42 U.S.C. § 4071(a)(1), but they are not general agents. Thus they must strictly enforce the provisions set out by FEMA and may vary the terms of [an SFIP] only with the express written consent of the Federal Insurance Administrator. 44 C.F.R. §§ 61.4(b), 61.13(d) & (e), 62.23(c) & (d). In essence, the insurance companies serve as administrators for the federal program. It is the Government, not the companies, that pays the claims. And when a claimant sues for payment of a claim, 'the responsibility for defending claims will be upon the Write Your Own Company and defense costs will be part of the ... claim expense allowance' [reimbursed by the government]. 44 C.F.R. § 62.23(i)(6)." *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 267 (3d Cir. 2004).

Private insurers participating in the WYO Program are authorized to issue policies under a number of different forms of the SFIP. Which SFIP form is used to insure a property is determined by the type of the insured property's occupancy. *See* FEMA National Flood Insurance Manual, GR 5, III, D, effective May 1, 2011, available at http://www.fema.gov/flood-insurance-manual/flood-insurance-manual-effective-may-1-2011 (hereinafter "Manual"). For an example relevant to this case, the General Property form of the SFIP is used for apartment

buildings, while the Residential Condominium Building Association Policy ("RCBAP") form of the SFIP is used for residential condominium buildings. 44 C.F.R. § 61, app. A(2)-(3). Other than the type of building each insures, the other primary difference between the different forms of the SFIP is the type of compensation and coverage available after a qualifying flood loss has been suffered. The General Property form provides flood insurance coverage on an Actual Cash Value ("ACV") basis. Under ACV policies, insureds are compensated for the cash value of lost or damaged property at the time of the flood loss, up to the total amount of ACV insurance purchased and subject to any deductible on the policy. [RCBAP SFIP, 17]. The RCBAP form, by contrast, provides coverage on a Replace Cost ("RC") basis. Under RC policies, insureds are compensated for the cost to replace lost or damaged property with new versions of the same or substantially similar property at the time of the loss, again up to the total amount of the RC insurance purchased and subject to any deductible, but also subject to "coinsurance penalties" unique to the RCBAP policy. Because FEMA wished to encourage condominium owners insuring their properties under the RCBAP form to carry adequate insurance to replace all or substantially all of the damaged property, it added "coinsurance penalties" or "copays" to the RCBAP SFIP, whereby policyholders who purchased insurance for less than 80% of the replacement value of the insured property would suffer reductions in the payouts of their policies. [RCBAP SFIP, 10]. The dispute presently before the Court arises out of the different eligibility requirements and methods of compensation provided by the General Property and RCBAP forms of SFIPs.

II. Factual Background

Sometime during or before the year 2007, Standard, through a broker not named by any of the parties, issued SFIPs on each of the four buildings comprising the Residences at Bay Point complex. At that time, the units in the building were rented out as apartments. [Albert Dweck Affidavit dated June 13, 2013, ¶ 1]. Plaintiff's unnamed broker collected the required information from Plaintiff and completed an application for NFIP flood insurance with Travelers Indemnity and Affiliates, a division of Standard, on the General Property form of the SFIP, indicating that the buildings to be insured were part of an apartment complex. [Michael Aronson Affidavit, Exhibit D]. It is undisputed that 1) Standard is a registered WYO program insurance company and acted on behalf of FEMA as a fiscal agent of the United States Government in issuing the Plaintiff's policies; 2) the General Property Form issued by FEMA provides coverage for, among other things, apartment complexes; and 3) Plaintiff's properties qualified for coverage under the General Property form at the time, before 2007, when they were initially issued. [Kim Berger Affidavit, ¶¶ 4-5; General Property SFIP, 1]. The source of the present dispute arose later, sometime in 2007, when the Residences at Bay Point were converted from apartment buildings to residential condominiums. [Dweck Aff., ¶ 1].

In or around 2008, after the condo conversion, Defendant Chernoff Diamond & Co., LLC ("Chernoff") took over from the unnamed broker as the insurance broker of record for the Residences' four policies. [Aronson Aff., ¶ 2]. At that time, the four policies were still written on the General Property Form. [Aronson Aff., ¶ 3]. Standard renewed all four policies in 2008 on the General Property Form. [Aronson Aff., ¶ 4]. Standard renewed the policies again in early

2009 for the period from March 30, 2009 to March 30, 2010.[1]  Sometime after the renewal, but

before August 2009, the bank holding the Residences' mortgages required the Residences to

obtain flood insurance on an RC basis, instead of an ACV basis for at least one of the

Residences' four buildings. [Chernoff Letter dated August 26, 2009]. According to Chernoff, the

Bank requested this change in coverage because at least one building in the Residences was no

longer an apartment complex, but had been converted into a residential condominium, and, by

bank policy, such condominiums had to be insured on an RC basis. *Id.* To secure RC coverage,

the Residences' SFIP on the building for which the bank held the mortgage would have to be

rewritten from the General Property onto the RCBAP form. *Id.* Accordingly, in a faxed letter

dated August 26, 2009, Chernoff Diamond requested that one of the policies written on the

General Property form be canceled and re-written onto the RCBAP form. *Id.* Later that year, in

November of 2009, the Residences decided not to cancel and rewrite the other three policies not

mentioned by the mortgagee bank. [Ohms Email to Dweck dated November 4, 2009]. Sometime

between August 2009 and 2011, a stretch of time not well covered in the record, Plaintiff,

through Chernoff, withdrew its request to cancel and rewrite the one policy it had identified in

Chernoff's August 28, 2009 letter. Accordingly, as of 2011, all four of the Residences' flood

---

[1] The Third Circuit has observed in other contexts that it is the standard practice of the insurance industry to rely upon the information provided by the insured in the original application in the issuance of renewals. *See Batka v. Liberty Mut. Fire Ins. Co.*, 704 F.2d 684, 687 (3d Cir. 1983) ("The general rule appears to be that in the absence of a new application renewal of a fire insurance policy is made on the assumption that the facts disclosed in the original application are true . . . No authority has been called to our attention suggesting that either Pennsylvania or New Jersey would apply a different rule."). There is no dispute that up to and including the 2009 renewal, Chernoff did not correct the erroneous statements on Plaintiff's General Property forms that 1) the company sponsoring the condo conversion project rather than the condominium association was the named insured, and 2) the Residences at Bay Point were identified as apartments rather than condominiums.

insurance policies were still written on the General Property form of the SFIP. [Aronson Aff., ¶ 7].

During the years in which Plaintiff was obtaining and renewing its policies, FEMA followed its usual semi-annual procedure and issued updates to the National Flood Insurance Manual, one of the documents incorporated by reference into the federal regulations governing all SFIPs. [44 C.F.R. § 62.23(i)(1) (2003)]. The May 2011 revision of the Manual amended the section on "Reformation" to require, for the first time, policies written onto the wrong form of the SFIP to be rewritten onto the correct form at the same coverage limits. The Amendment further specified that the provisions of the correct form, not that on which the policy was erroneously issued or renewed, applied to the reformed policy. [Manual, GR 12, IX, D].[2]

Roughly three months after the new reformation provision of the Manual went into effect, on August 28, 2011, Plaintiff's buildings suffered minor flood damage during Hurricane Irene. Plaintiff timely filed an insurance claim with Standard, which Standard processed and partially paid. There was no damage to the building insured under policy 6010009257. The building insured under policy 6010009258 suffered $4,309.07 in damage, but this number fell below Plaintiff's $5,000 deductible, so no payment was made. The remaining two buildings, insured under policies 6010009255 and 6010009256, suffered damage in excess of the deductible, and Standard paid Plaintiff $20.20 and $8,918.78 respectively in late September or early October 2011. [Dweck Aff., Exhibit A]. Standard paid out on Plaintiff's General Property policies,

---

[2] "**D. Reduction of Coverage Limits or Reformation**

. . . **NOTE**: When coverage is issued using an incorrect SFIP form, the policy is void and the coverage must be written under the correct form. The provisions of the correct SFIP form apply. The coverage limits must be reformed according to the provisions of the correct SFIP form and cannot exceed the coverage limits originally issued under the incorrect policy."

despite the fact that the insured buildings were no longer apartments but had been converted to condominiums in 2007.

Plaintiff subsequently renewed all four General Property policies with Standard, sometime early in the year 2012, insuring the buildings for the period between March 30, 2012 and March 30, 2013. [Aronson Aff., Exhibit D]. These policies, like all those issued previously, were written on the General Property form and named The Residences at Bay Point, LLC, the company which formerly administered the apartment complex and sponsored the conversion of the Residences into residential condominiums, as the insured. On May 16, 2012, Chernoff wrote to Standard requesting that the Residences at Bay Point Condominium Association, Inc., be substituted as the named insured on all four policies. [White Email to Travelers dated May 16, 2012]. For reasons not contained within the record, no substitution of the named insured occurred and all four policies remained in the name of the Residences at Bay Point, LLC.

On October 29, 2012, Hurricane Sandy made landfall in New Jersey and all four of Plaintiff's buildings insured by Standard suffered significant flood damage. Plaintiff again timely filed a claim for the damage to all four buildings. After reviewing Plaintiff's claim, Standard sent Plaintiff a letter, dated November 29, 2012, explaining that RCBAP policies are required for residential condominium properties, and requesting that an authorized representative of the Residences at Bay Point Condominium Association verify that the four properties for which Plaintiff had submitted claims were indeed "held in the condominium form of ownership." [Berger Aff., Exhibit A-1]. Sometime later, Albert Dweck, on behalf of the Association, returned the letter with a verification that the Residences were held in the condominium form of ownership. *Id.* On December 11, 2012, Chernoff submitted proof of the replacement cost of the damage to the buildings, signed by Plaintiff. [Berger Aff., Exhibit A-2]. Later, on January 7,

2013, a representative from Chernoff communicated with an employee of Standard via email to request a status update on the reformation of Plaintiff's policies. *Id.* This email exchange evidences that at least Chernoff, Plaintiff's agent, was aware that some form of policy reformation might occur as early as January 2013.

Standard sent renewal notices for each of Plaintiff's four existing General Property policies on February 13, 2013. [Flood Insurance Renewal Premium Notices, dated February 13, 2013, attached to Dweck Aff.]. In an email exchange between the same two Chernoff and Standard employees that had communicated in January, Standard advised Chernoff to disregard the renewal notices because the reformation process was not yet complete. [Berger Aff., Exhibit A-2]. Finally, in a letter dated May 20, 2013, Standard formally informed Chernoff that Plaintiff's four flood insurance policies, initially written on the General Property form, had been reformed and rewritten onto the RCBAP form. [Travelers Letter to Chernoff dated May 20, 2013]. Standard promptly refunded Plaintiff's excess premiums and began paying out the on the reformed policies.

Standard reformed Plaintiff's policies in accordance with the amendment to the National Flood Insurance Manual added by FEMA in May 2011. It rewrote the General Property polices onto the RCBAP form at the level of coverage that the Residences had held on the General Property form ($250,000) and applied the terms and conditions of the correct RCBAP form to the policies. As explained above, one of the terms unique to the RCBAP form is the imposition of "coinsurance penalties" on policies covering less than 80% of a property's replacement value. The maximum amount of coverage available under the General Property form is $250,000, the amount held by the Residences. The RCBAP form, however, can insure a property up to $1,000,000 or the replacement cost of the property, whichever is lower. [RCBAP SFIP]. The

value of Plaintiff's buildings was such that the $250,000 of coverage plaintiff held in each of its four reformed RCBAP SFIPs was less than 80% of the replacement value for each of the four insured buildings. [Complaint, pg. 6, ¶8].[3] Plaintiff's claim therefore became subject to the coinsurance penalties imposed by FEMA, and Plaintiff's insurance recovery was reduced in the amount of $361,696.87. *Id.* The present dispute arose because Plaintiff received substantially reduced coverage under its SFIPs – lower than that to which it understood itself to be entitled.

III. Procedural History

Plaintiff commenced this action by a Complaint on April 10, 2013, naming the Standard Fire Insurance Company and Chernoff Diamond & Co., LLC as defendants. On May 14, 2013, Standard responded by filing a pre-Answer Motion to Dismiss all claims against it pursuant to Rule 12(b)(6). Chernoff Answered the Complaint on June 10, 2013, and, shortly thereafter, on June 17, filed a Response in Opposition to Standard's Motion. Plaintiff also submitted its Response in Opposition to the Motion on June 17. Standard filed its Reply to both Oppositions on July 29, 2013. Along with their Opposition papers, both Plaintiff and Chernoff submitted affidavits and other evidence not contained within the Complaint, along with a request that Standard's Motion be treated as one for Summary Judgment under Rule 56. Standard, in its Reply, agreed that the Motion should be converted. Accordingly, the Court, pursuant to Rule 12(d), converted Standard's Motion to one for Summary Judgment on October 9, 2013, simultaneously also granting Plaintiff's request to supplement the record. Plaintiff filed its

---

[3] The Complaint is consecutively paginated, but restarts the numbering of paragraphs in each new section. Accordingly, both the page number and paragraph number are provided in citations to the Complaint.

supplementary Reply brief on October 24. Standard responded with a request to file a Sur-Reply on October 28, which was granted by the Court. Standard filed its Sur-Reply on November 6, 2013, completing briefing on the Motion.

IV. Standard of Review

Under Fed. R. Civ. P. 12(d) "[i]f, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a

genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57. "A non-moving party may not 'rest upon mere allegations, general denials or . . . vague statements. . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

V. Jurisdiction

Plaintiff asserts that this court has jurisdiction over all claims in the present action under 42 U.S.C. § 4053 and, alternatively, also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. [Complaint, pg. 3, ¶ 8]. The Third Circuit has explicitly held that § 4053 conferred subject matter jurisdiction upon the district court only for policies issued under Part A of the National Flood Insurance Program. Part A of the Program has been discontinued, and the policies at issue in this case were issued under Part B, which is addressed in 42 U.S.C. §

4072. It is, therefore, well established that this Court has no jurisdiction over any of Plaintiff's claims under § 4053. *Van Holt*, 163 F.3d at 167.

The Court nevertheless does have jurisdiction over both Plaintiff's federal and state law claims, because the Third Circuit has held that Congress intended § 4072 to vest the District Court with exclusive and original jurisdiction over federal law contract and state law tort claims arising from the adjustment of polices issued under Part B of the NFIP. *Van Holt*, 163 F.3d at 167 ("42 U.S.C. § 4072 vests district courts with original exclusive jurisdiction over suits by claimants against WYO companies based on partial or total disallowance of claims for insurance arising out of the National Flood Insurance Act."); *Id.* ("We now determine that Congress, had it considered the specific question, would have intended to confer original exclusive jurisdiction on the district court over claims sounding in tort arising out of the investigation or adjustment of insurance policies arising out of the administration and sale of insurance under the NFIA."). Because this Court has original and exclusive jurisdiction over Plaintiff's state law tort claims arising from the adjustment of Plaintiff's federal insurance policies, no discussion of supplemental jurisdiction is necessary.

VI. Standing of Chernoff to Oppose the Motion

In its Response Brief, Standard argues that Chernoff, as a codefendant without any cross-claims pending against Standard, lacks standing to oppose Standard's Motion. As an initial matter, this Court notes that neither Standard nor Plaintiff has cited precedent binding upon the Court on this issue. Indeed, it appears that the Third Circuit has not yet addressed this issue directly. In support of its position, therefore, Standard cites as persuasive precedent, among

others, the Eastern District of Louisiana case of *Dorvin v. 3901 Ridgelake Drive, LLC*, 11-cv-00696, 2012 WL 1057599 (E.D. La. Mar. 28, 2012), and the District of Minnesota case of *Hawes v. Blast-Tek, Inc.*, 09-cv-365, 2010 WL 2680778 (D. Minn. July 2, 2010). The different factual circumstances and procedural postures of those cases, however, illustrate why this Court now finds that Chernoff has standing to oppose the present Motion.

In both *Dorvin* and *Hawes*, the district court found that a codefendant without any pending cross-claims lacked standing to oppose the defendant's motion for summary judgment when the *plaintiff did not oppose the motion*. *See Hawes*, 2010 WL 2680778 at *1 ("The question is whether the Court should consider [Defendant's] arguments. That is, can [Defendant] prevent dismissal of [Plaintiff's] claim against its co-Defendants, when [Plaintiff] himself agrees that those claims should be dismissed. . . In the Court's view, this question must be answered in the negative."); *Dorvin*, 2012 WL 1057599 at *4 ("[C]o-defendants do not have standing to oppose a defendant's motion for summary judgment when the motion is unopposed by the plaintiff."). In other words, those courts held that a defendant cannot force a plaintiff to proceed with the prosecution of claims against codefendants counter to the plaintiff's wishes. Here, there is no such conflict of interests. Plaintiff has adopted and endorsed the arguments and supporting affidavits of Chernoff in its own Opposition to Standard's Motion.

Standard also argues that these cases suggest that the proper vehicle for Chernoff's arguments would be a cross-claim, rather than an Opposition to the Motion, and that in the absence of such a cross-claim, Chernoff is not a "party" to the present motion with standing to oppose. Standard's position misapprehends the underlying purpose of the standing doctrine. Courts are charged with ensuring that there is a real case or controversy before them prior to rendering a decision. Accordingly, the necessity of a cross-claim for a defendant to oppose a

codefendant's motion is only present where the absence of opposition from the plaintiff eliminates any real case or controversy before the court. The court's discussion in *Hawes* makes as much clear. ("In the Court's view, the present situation is no different than if [Plaintiff] had stipulated to the dismissal of [co-Defendants] under Federal Rule of Civil Procedure 41; or had moved to amend his Complaint to drop his claims against these [co-]Defendants under Rule 15, or had requested that they be dropped as [co-]Defendants under Rule 21. In the absence of a cross-motion by [Defendant] against [co-Defendants], no basis would exist to deny such relief under any of these Rules.")[4] *Hawes*, 2010 WL 2680778 at *2. Hence, Plaintiff here has opposed Defendant's Motion, and Chernoff may also oppose the Motion.

## VII. Federal Breach of Contract

As a preliminary matter, Plaintiff's arguments must be divided into those arising from allegations in the Complaint and those appearing only in briefing. As this court has not granted Plaintiff leave to amend the Complaint, only the former category of allegations and arguments is properly before me. *See Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (quoting *Commw. Of Pa. ex. rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)) ("'It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'"); *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment. . . . At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).") (internal citations

---

[4] *See* Jonathan A. Wolfson, *Warring Teammates: Standing to Oppose A Coparty's Motion for Summary Judgment*, 60 Drake L. Rev. 561 (2012).

omitted). Accordingly, the Court will not now decide Plaintiff's arguments raised only in

briefing: 1) that Defendant breached the General Property Policies in 2011 by failing to reform

them to RCBAP policies,[5] 2) that Defendant breached the General Property SFIPs only as to two

---

[5] In its Opposition to Defendant's Motion, Plaintiff introduced a new theory of breach of contract liability to include Defendant's 2011 honoring of Plaintiff's policies written on the General Property form. In May 2011, FEMA amended the guidelines in its Flood Insurance Manual to require reformation of policies written onto the wrong form. Plaintiff's claimed loss from Hurricane Irene occurred in October 2011, months after the guidelines were published and went into effect. If Standard was obligated under the SFIP by law promulgated in May of 2011 to reform Plaintiff's policies in May of 2012, then Standard had the same legal duty under the SFIP to reform the policies in October of 2011. Plaintiff argues that Standard's failure to reform in October of 2011 deprived Plaintiff of the opportunity to secure appropriate coverage before Plaintiff's much larger loss in 2012. To hold otherwise would undermine the objectives of efficient administration of the NFIP. In its Opposition to Standard's Motion, Defendant Chernoff also elaborated on this claim, arguing that in the wake of Irene "Standard paid out losses under [the General Property] policies rather than convert the policies to the RCBAP form, which would have generated a lower premium for Standard." [Chernoff Opp., 12].

This breach of contract claim, for failure to reform the contracts in 2011 in the wake of Hurricane Irene, is, in essence, just a recasting of Plaintiff's federal estoppel claim, discussed below. Nevertheless, it is worth noting that Plaintiff is unlikely to prevail on this claim. Firstly, Chernoff's suggestion that Standard might have been motivated not to reform in 2011, despite knowledge that the policies were written on the wrong forms, in order to retain higher premiums and/or collect higher premiums in the future, is undercut by the structure of the NFIP. "[F]lood insurance premiums are funds of the Federal Government," and, accordingly, "[p]remium refunds to applicants and policyholders required pursuant to rules contained in the National Flood Insurance Program (NFIP) 'Flood Insurance Manual' shall be made by the Company from Federal flood insurance funds." 44 C.F.R. § 62, app. A(1), art. III(E). Any loss from refunding or otherwise losing Plaintiff's premiums is thus, under the NFIP, borne by the federal treasury, not Standard. Secondly, even assuming that Standard had a duty under the contract to reform the policies in 2011, and breached that duty by failing to do so after Hurricane Irene, neither Chernoff nor Plaintiff have presented any damages to Plaintiff arising from this breach. Plaintiff's incorrect General Property policies were honored as written in 2011 as a result of Standard's alleged breach: this outcome is the *remedy* in damages requested by Plaintiff in the present action for Standard's alleged 2012 breach. The suggestion that Plaintiff would have then had notice of the need to secure more coverage is unavailing. Firstly, the record establishes that Plaintiff had notice of the coverage problem as early as 2009. [Chernoff Letter dated August 26, 2009]. Secondly, the causal connection between Plaintiff's alleged injury in 2012 and Defendant's failure to reform in 2011 is too attenuated to allow for recovery. Plaintiff's intervening decision to buy more coverage would be required to have changed the outcome in this case. The record shows not only was that decision not likely, Plaintiff actually chose not reform at least one policy, even after its mortgage provider demanded the change to the RCBAP form. [Aronson Aff., ¶ 7].

of Plaintiff's four buildings, because, while the Manual requires General Property Policies issued on residential condominiums to be reformed to RCBAP policies, these two buildings (Buildings 10 and 12 as identified in the October 23 Dweck Aff.) were not "residential condominiums" as defined by the SFIPs, and 3) that Defendant breached all four of the reformed RCBAP SFIPs when it applied coinsurance penalties because Plaintiff carried the "maximum amount of coverage" available as defined in the reformed SFIPs.

Instead, the Court proceeds as follows. As discussed in footnote 5, *supra*, Plaintiff's first argument is largely a rehashing of its estoppel claim, which is decided below. Concerning the second argument, Plaintiff's assertion that two of its four buildings were not residential condominiums caught both Standard and this Court by surprise, given the contents of the Complaint. *See* Complaint, pg. 2, ¶ 4 (identifying Plaintiff as "[t]he Residences at Bay Point, a residential condominium complex."). In its Sur-Reply, Standard admits, however, that the affidavit attached to Plaintiff's supplementary Reply potentially raises questions of material fact as to the insurability of two of Plaintiff's four buildings, depending upon the proper definition of "residential condominiums" under the SFIP.[6] [Sur-Reply, 5 n. 4]. This issue has neither been

---

[6] The primary point of dispute as to whether and which of Plaintiff's buildings qualify as residential condominiums is the interpretation of SFIP Form Section II, ¶ 25 ("**Residential Condominium Building**. A **building**, owned and administered as a **condominium**, containing one or more family units and in which at least 75 percent of the floor area is residential."). Plaintiff contends that "75 percent of the floor area is residential" means that 75 percent of the building's floor area is currently occupied as residences. Because two of the four buildings in the Residences were less than 75 percent occupied at the time of Hurricane Sandy, Plaintiff argues they were not "residential condominiums" under the SFIP. Since this contention is not pled by Plaintiff and not fully briefed by the parties, I make no advisory comment upon the validity of such an interpretation. I do instruct, however, that any amended pleading or further briefing on the issue must directly address the "Condominium" chapter of the Manual effective May 1, 2011, available at http://www.fema.gov/pdf/nfip/manual201105/content/06_condo.pdf (dividing condominiums into four classes, with classes A and B identified as "Residential" and classes C and D identified as "Non-Residential (Commercial)"), as well as the General Rules chapter of

pleaded nor fully briefed, and accordingly the Court will not consider Plaintiff's second argument. Plaintiff will be given leave to file an amended complaint consistent with these proposed facts and arguments within 20 days.  Plaintiff's third argument, which will be decided by the meaning under the NFIP of the "maximum amount of insurance available," has also neither been pleaded nor properly briefed, and again Plaintiff will be given leave to file an amended complaint consistent with such a claim within 20 days.

The only breach of contract claim now before the Court is the one raised in the Complaint, namely that in the wake of Hurricane Sandy in 2012, Standard breached all four of its General Property SFIP contracts with Plaintiff by unilaterally reforming those policies to the RCBAP form, applying RCBAP form coinsurance penalties, and otherwise refusing to honor the General Property contracts as written. *See* Complaint, pg. 6, ¶ 10 ("The attempted unilateral reformation of the policies and the refusal to adequately compensate plaintiff for damages related to the storm under the subject policies is a breach of the insurance contract.").

Plaintiff's argument proceeds in three parts. First, Plaintiff argues that Standard had a duty to honor the terms of Plaintiff's four General Property form SFIPs after Plaintiff's property sustained damage during Hurricane Sandy. Second, Plaintiff argues that Standard breached that duty as to all four General Property SFIPs in May of 2012 when it "unilaterally reformed" the SFIPs to the RCBAP form. Third and finally, as a result of the reformation, Plaintiff suffered injury in the amount of the reduction in Plaintiff's insurance recovery incurred as a result of the application of coinsurance penalties not provided for in the General Property form of the SFIP ($361,696.87). [Complaint, pg. 5-6, ¶ 8]. Standard Fire responds to each contention, first, that the

---

the Manual, GR 5-6, III, D, "Determination of Building Occupancy" (defining at least one
category of residential buildings as "buildings designed for principal use as a dwelling place").

General Property policies could not provide coverage to Plaintiff's condominiums as a matter of federal law, second, that Standard's actions in reforming the flood insurance contracts were required by law, as interpreted by FEMA regulations, and third, that any losses of insurance recovery incurred by Plaintiff as a result of the reformation are therefore not damages attributable to Standard. The primary thrust of Standard's argument, however, is simply that because its actions were mandated by law, no breach of contract occurred.

The first question this Court must answer is whether the General Property Policies held by Plaintiff in the fall of 2012 could provide flood insurance coverage to Plaintiff's four buildings. Although the submission of Chernoff attempted to muddy the waters by selectively quoting policy language about "condominiums" generally, it is indisputable that the General Property SFIPs do not provide coverage for "residential condominiums." [General Property SFIP, 1 ("THIS POLICY PROVIDES NO COVERAGE . . . FOR A RESIDENTIAL CONDOMINIUM BUILDING, AS DEFINED IN THIS POLICY") (emphasis in original); *id.* at IV, ¶ 17 ("PROPERTY NOT COVERED: A **residential condominium building**.") (emphasis in original)]. Residential condominiums are defined in all SFIPs as buildings held in the condominium form of ownership where more of than 75% of the floor area is residential. [General Property SFIP, II, ¶ 25; *accord* RCBAP SFIP, II, ¶ 25]. In the second Dweck affidavit (dated October 23, 2013), Plaintiff admitted that two of Plaintiff's four buildings fall within this definition (Buildings 9 and 11). The other two buildings (Buildings 10 and 12) may or may not qualify as a residential condominiums as discussed in footnote 6, *supra*. Plaintiff has already been given leave to file an amended complaint arguing that those two buildings (10 and 12) fall outside the definition, and the Court will constrain its present analysis to the two undisputedly

residential condominium buildings (9 and 11). Because these two buildings are "residential condominiums" under the SFIP, they are not insurable under the General Property Form.

Now that it has been decided that at least two of Plaintiff's policies were incorrectly written onto the General Property Form, the next question that must be decided is whether Standard was obligated by law to reform those policies to RCBAP policies. Standard contends that the FEMA Claims Manual obligated it to reform Plaintiff's SFIPs. Plaintiff contends that the relevant provision in the Manual does not apply to the case at bar, because the Manual is purely advisory, and because by its terms the provision does not apply. Firstly, the Third Circuit has explicitly recognized that following the guidance of the Flood Insurance Claims Manual is mandatory for WYO companies like Standard. *Suopys v. Omaha Property & Cas.*, 404 F.3d 805, 811 (3d Cir. 2005) ("FEMA's regulations are controlling regarding the application of the SFIP by WYO Companies. 44 C.F.R. Pt. 61, App. A(1). The FEMA Claims Manual . . . is incorporated by reference into the FEMA regulations (44 C.F.R. § 62.23)."). *See also id.* at 807:

> WYO Companies are bound to adjust claims in accordance with the terms of the SFIP. The SFIP requires that in adjusting claims, the WYO Company apply its own company standards *guided by NFIP Claims manuals issued by FEMA*. 44 C.F.R. § 62.23(i)(1) (2003). WYO carriers may not alter, amend, or waive any provision or condition of the SFIP absent express written consent from the Federal Insurance Administrator. 44 C.F.R. Pt. 61, App. (A)(1), Art. 9(D)(2000)/ Art. VII(D) (2003); 44 C.F.R. § 61.13(d) (2003).

(emphasis added). Secondly, this Court finds that the note in Manual, GR 12, IX, D, directly applies to the situation at bar:

### D. Reduction of Coverage Limits or Reformation[7]

---

[7] Plaintiff asserts that the fact that part of the title of section D, "Reduction of Coverage Limits" and much of the content of the section address circumstances not present in this case, the note following should not apply. The Court finds that Plaintiff's analysis overlooks the clear disjunctive "or Reformation" in the section's title, and the fact that the Note addressing

. . . **NOTE**: When coverage is issued using an incorrect SFIP form, the policy is void and the coverage must be written under the correct form. The provisions of the correct SFIP form apply. The coverage limits must be reformed according to the provisions of the correct SFIP form and cannot exceed the coverage limits originally issued under the incorrect policy.

At least two of Plaintiff's buildings were residential condominiums with policies written on the General Property form. The General Property form does not provide coverage for residential condominiums. The two policies (for Buildings 9 and 11), were, accordingly, "issued using an incorrect SFIP form." The coverage therefore had to be rewritten onto the correct form. RCBAP policies are the only SFIPs providing coverage to residential condominium buildings, and accordingly the RCBAP form was the correct one in this case. Standard thus complied with the terms of the Manual when it reformed Plaintiff's policies on Buildings 9 and 11. Plaintiff's federal breach of contract claim on the basis of the 2012 reformation of the two buildings identified in the second Dweck Affidavit as residential condominiums is, therefore, dismissed with prejudice, and judgment is entered for Standard.

VIII. Federal Estoppel

Plaintiff also argues that Standard should be equitably estopped from asserting the mandatory reformation Guideline against Plaintiff because Standard, in 2011, paid claims made on Plaintiff's policies despite the fact that the policies were written on the improper General Property form. Stated simply, Plaintiff claims that Standard's failure to reform in 2011 should have estopped Standard from reforming in 2012.

---

mandatory policy reformation was added to the section later than the rest of the content by FEMA officials.

"The burden of proof is on the party claiming estoppel." *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987). To establish the traditional elements of an estoppel claim, a litigant must prove "(1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." *Id.* Additionally, the Third Circuit has long held that for a litigant to prevail in an estoppel claim against the government, the "litigant must not only prove the traditional elements of estoppel, but she also must prove affirmative misconduct on the part of the government." *Id. See, e.g.*, *Lesse v. Adelphoi Vill., Inc.*, 516 F. App'x 192, 194 (3d Cir. 2013); *Ali-Bocas v. Ashcroft*, 67 F. App'x 83, 88 (3d Cir. 2003).

Assuming, *arguendo* that Standard's 2011 payout and 2012 renewal of Plaintiff's General Property policies qualify as misrepresentations for estoppel purposes, Plaintiff's claim still fails because, according to clear Supreme Court precedents, Plaintiff could not have reasonably relied upon any alleged misrepresentation by Standard about the content or coverage of its policies.[8] The Appropriations Clause of the United States Constitution prevents the judiciary from ordering the disbursal of funds not appropriated by Congress. *See Office of Personnel Management v. Richmond*, 496 U.S. 414, 428 (1990) ("Extended to its logical conclusion, operation of estoppel against the Government in the context of payment of money from the Treasury could in fact render the Appropriations Clause a nullity."). Accordingly, "[w]here federal funds are implicated, the person seeking those funds is obligated to familiarize himself with the legal requirements for receipt of such funds." *Wright v. Allstate Ins. Co.*, 415 F.3d 384 (5th Cir. 2005); *accord Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) ("Whatever form in which the

---

[8] It is also worth noting that Plaintiff has not pled affirmative misconduct on the part of Standard in the handling or adjustment of Plaintiff's claim. The only pleading which could generously be construed as alleging affirmative misconduct by Standard concerns the transmission of renewal notices on Plaintiff's General Property Policies shortly before the reformation of those policies. The correspondence between Chernoff and Standard makes clear that Plaintiff was aware that the renewal notices had been sent in error. [Berger Aff., Exhibit A-2].

Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority."); *Heckler v. Cmty. Health Services of Crawford County, Inc.*, 467 U.S. 51, 63 (1984) ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law . . . . [T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."). Because the funds sought from Standard by Plaintiff would be drawn from the federal Treasury, it follows that an estoppel claim to force the payment of the funds is barred by the Constitution. *See* 44 C.F.R. § 62, app. A(1), art. III(D)(1-2).

Plaintiff nevertheless argues that because the FEMA administrator may choose in certain cases not to reimburse WYO Companies for litigation costs and judgments, the funds at issue in its equitable estoppel claim are not necessarily Government funds, and accordingly the Appropriations Clause would not be offended by permitting a claim of estoppel on an SFIP to go forward. While Plaintiff is correct that an administrative process exists whereby the defense costs of, and money judgments awarded against, a WYO insurer as a result of the breach of or handling of a claim under the SFIP may not be reimbursed by the federal Government, the law of this Circuit presumes that in most such suits federal funds are implicated.[9] The Third Circuit's

---

[9] One reason why courts must find that actions for recovery under an SFIP ordinarily are actions for federal funds is because the determination by an executive branch official as to whether to deny a WYO company reimbursement for its defense costs can only be made *after* a money judgment has been awarded against the company. Any suggestion by Plaintiff that this court should allow an estoppel action to go forward on the presumption that a FEMA official will later

decision in *Van Holt* relied on the belief that "FEMA reimburses the WYO companies for their defense costs." 163 F.3d at 165; *Accord C.E.R. 1988, Inc. v. Aetna Cas. And Sur. Co.*, 386 F.3d 263, 270-71 (3d Cir. 2004) ("[I]t appears that ordinarily FEMA will be responsible financially for the costs of defending a lawsuit against a WYO company."). This accords with the view prevailing in other circuits that claims on SFIPs against WYO insurers are actions for federal funds. *See Wright v. Allstate Ins. Co.*, 415 F.3d 384, 389 (5th Cir. 2005); *Gibson v. Am. Bankers*, 289 F.3d 943, 946 (6th Cir. 2002); *United States v. Fowler*, 913 F.2d 1382, 1386-86 (9th Cir. 1990).

Plaintiff purchased its SFIPs from Standard. Standard, in turn, issued those policies as the fiscal agent of the United States, administering the NFIP, a Government program funded by moneys drawn from the federal treasury. *See* 44 C.F.R. § 62, app. A(1), art. III(D)(1) ("Loss

---

make a determination that Standard's costs are non-reimbursable in reality asks this court to usurp the FEMA official's role and make a determination before-the-fact that the official will judge the funds non-reimbursable. For reimbursement claims procedure see 44 C.F.R. § 62, app. A(1), art. III(D)(3) ("Following receipt of notice of such litigation, the FEMA Office of the Chief Counsel ('OCC') shall review the information submitted. If the FEMA OGC [sic] finds that the litigation is grounded in actions by the Company that are significantly outside the scope of this Arrangement, and/or involves issues of agent negligence, then the FEMA OCC shall make a recommendation to the Federal Insurance Administrator regarding whether all or part of the litigation is significantly outside the scope of the Arrangement." *Id.* at III(D)(3)(a). "In the event the Federal Insurance Administrator agrees with the determination of the FEMA OCC under Article III, Section D.3.a then the Company will be notified in writing within thirty (30) days of the Federal Insurance Administrator's decision that any award or judgment for damages and any costs to defend such litigation will not be recognized under Article III as a reimbursable cost, expense or expense reimbursement." *Id.* at III(D)(3)(b). "In the event that the Company wishes to petition for reconsideration of the determination that it will not be reimbursed for any part of the award or judgment or any part of the costs expended to defend such litigation made under Article III, Section D.3.a-c, it may do so by mailing, within thirty (30) days of the notice that reimbursement will not be made, a written petition to the Federal Insurance Administrator, who may request advice on other than legal matters of the WYO Standards Committee established under the WYO Financial Control Plan. The WYO Standards Committee will consider the request at its next regularly scheduled meeting or at a special meeting called for that purpose by the Chairman and issue a written recommendation to the Federal Insurance Administrator. The Federal Insurance Administrator's final determination will be made in writing within a reasonable time to the Company." *Id.* at III(D)(3)(d).).

payments under policies of flood insurance shall be made by the Company from Federal funds."); *id* at III(D)(2) ("Loss payments include payments as a result of litigation that arises under the scope of this Arrangement."). Plaintiff's attempt to estop Standard from enforcing the reformation Guideline governing Plaintiff's policy in order to bring about a larger disbursal of insurance proceeds is therefore an action for federal funds, and, accordingly, is barred.

IX. Preemption of State Law Claims

The Supremacy Clause of the United States Constitution is the basis of all federal preemption of state law. "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *C.E.R. 1988, Inc. v. Aetna Cas. And Sur. Co.*, 386 F.3d 263, 268 (2004). Yet, "[t]he Court may nonetheless conclude that the [federal] Program preempts state law under one or more of three theories: express preemption,[10] field preemption[11] . . ., and conflict preemption.[12]" *Id.* The Third Circuit has found state law tort claims arising from the "handling" of a plaintiff's claims on an SFIP to be both expressly and conflict preempted by federal law. *C.E.R.*, 386 F.3d at 272; *Id.* at 269 n. 6.[13] In the same opinion,

---

[10] The disallowance of state law claims by express preemption occurs "when a statute or regulation contains explicit language to that effect." *C.E.R.*, 386 F.3d at 269 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)).

[11] Field preemption exists if "'federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.'" *C.E.R.*, 386 F.3d at 269 (quoting *Cipollone v. Ligget Group, Inc.*, 505 U.S. 504, 516 (1992)).

[12] "Conflict preemption . . . occurs 'when it is impossible to comply with both the state and federal law, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *C.E.R.*, 386 F.3d at 269 (quoting *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 222 (3d Cir. 2001)).

[13] As noted, by the circuit court in *C.E.R.*, all SFIPs now contain an express preemption clause: "**IX. What Law Governs.** This policy and all disputes arising from the handling of any claim under the policy are governed exclusively by the flood insurance regulations issued by FEMA,

the Circuit Court declined to determine whether claims arising from the "procurement" of SFIP policies were preempted. *Id.* at 271 n. 12. This Court must therefore, first determine whether Plaintiff's New Jersey fraud and negligence claims sound in policy "handling" or "procurement." Only after that determination has been made would the Court conceivably need to reach the question whether procurement claims are also preempted by federal law. Because this Court finds Plaintiff's state law claims sound in policy handling, those claims are preempted, and no discussion of matters as yet undecided by the Third Circuit is necessary.

Observing this well established law, Plaintiff rests the argument that its state law claims are not preempted on the contention that Standard committed fraud and was negligent in the processes surrounding Plaintiff's *procurement* of General Property Insurance Policies, not the *handling* of its subsequent claims under the policies.[14] Specifically, the two acts which Plaintiff alleges were fraudulent or negligent during policy procurement were 1) Standard's February 2013 transmission of renewal notices to Plaintiff for all four General Property SPIFs and subsequent May 2013 reformation of those policies, [Complaint, pg. 7, ¶ 3 ("Defendant Standard's acts and omissions, as set forth in the First Cause of Action, and its subsequent attempt to renew the same policies which it now refuses to honor, constitute a violation of the New Jersey Consumer Fraud Act")], and 2) Standard's initial issuance[15] or latest renewal of the

---

the National Flood Insurance Act of 1968 (42 U.S.C. § 4001, *et seq.*) and Federal common law." *See* 44 C.F.R. § 61, app. A(2), art. IX.

[14] The Complaint is inconsistent in its characterization of the claim. *See* Complaint, pg. 2, ¶ 2 ("[A]cts and omissions regarding the procurement of the flood insurance policies for plaintiff, which are not being honored by Standard"); *compare* Complaint, pg. 3, ¶ 7 ("The claims asserted herein arise out of the 2012 storm known as 'Hurricane Sandy' (hereinafter sometimes referred to as the 'storm') and relate to the handling of a flood claim by defendant Standard.")

[15] Plaintiff has provided no evidence that when Standard, through an unnamed insurance broker, issued the General Property policies in the period before 2007, the policies failed to provide adequate coverage. All the evidence in the Record is to the contrary, namely prior to 2007 the Residences were apartment buildings properly insured under the General Property SFIP.

four policies, [Complaint, pg. 8, ¶¶ 2-3 ("Standard owed plaintiff a duty to sell/renew the flood insurance policies it sold to plaintiff which would provide adequate coverage in the event of a covered event. . . . Standard breached that duty owed to plaintiff by selling plaintiff four (4) General Property policies in place at the time of the occurrence which it now states can not [sic] or will not be honored.")].  Plaintiff does not cite to any controlling law in support of its argument that reformation and renewal fall within the ambit of claims procurement. Instead, Plaintiff offers the case of *Campo v. Allstate Ins. Co.*, 562 F.3d 751 (5th Cir. 2009), from the Fifth Circuit, and, *inter alia*, the district court opinions of *Williams v. Standard Fire Ins. Co.*, 892 F. Supp. 2d 615 (M.D. Pa. 2012), and *Paladino v. Standard Fire Ins. Co.*, 616 F. Supp. 2d 538 (E.D. Pa. 2008), from this circuit, as persuasive precedent.[16]

In *Campo*, the plaintiff's coverage under an SFIP had expired shortly before the plaintiff's property suffered flood damage during Hurricane Katrina. Because of the extent of the disaster, FEMA allowed for an extended grace period in which the plaintiff could pay his renewal premium and, in return, have his policy retroactively reinstated for the period of the loss. The defendant insurance company sent plaintiff an advance on his claim and prepared to pay plaintiff's policy, without informing plaintiff that the payments were conditioned upon ultimate receipt of the delinquent premium payment. After the grace period provided for by FEMA elapsed with no premium paid by plaintiff, the defendant insurance company refused to pay

---

Accordingly, the Court will treat Plaintiff's negligence claim as if it were based solely upon the March 2011 policy issuance (the last policy renewal prior to Hurricane Sandy).

[16] *Compare Dudick v. Nationwide Mut. Fire Ins. Co.,* 2007 WL 984459 (E.D. Pa., Mar. 27, 2007) ("The court concludes that Plaintiffs' claims are for benefits sought under or in connection with the flood insurance policy, and also that Plaintiffs' asserted claims for damages are for amounts within the policy limits. Therefore, all of Plaintiffs' claims [for fraud and misrepresentation] are little more than an attempt to recover-under tort theories-their asserted benefits due under the policy. . . . [E]xamination and interpretation of the Policy are required to determine the merits of all of Plaintiffs' claims against Defendants. Interpretation of the Policy is a matter clearly intended to be preempted by the NFIA. *See*, *C.E.R.* 386 F.3d at 270, 272.").

plaintiff's policy, on the grounds that it had lapsed, and demanded return of the advance. Plaintiff

sued for state law fraud and misrepresentation. The Fifth Circuit found that the insurance

company's conduct, in failing to inform plaintiff of the required premium during the belated

policy renewal and refusing to pay the policy, related to claims *procurement*, not handling, and

accordingly, was not preempted by the NFIP. *Campo*, 562 F.3d at 756. Plaintiff asserts that this

holding establishes that policy renewal is *procurement* and not *handling*.

As an initial matter, this Court reads *Campo* differently. The analysis in the decision

makes it clear that the belated renewal sounded in policy procurement, rather than claims

handling, not because it was the renewal of a policy then in effect, but precisely because there

was an interruption in coverage such that at the time of the alleged misrepresentation there was

no policy under which claims could be handled. *See Campo*, 562 F.3d at 756:

> To the extent that this case involves handling of a 'claim,' it is merely a 'fictitious claim'
> in the sense that the act of filing a claim on an expired policy, i.e., a dormant policy, is
> equivalent to filing no claim at all. At the relevant time, Campo's policy had expired
> subject to restoration only in the event that he paid the premium within the extended
> grace period. Allstate was thus by definition incapable of handling any new claims based
> on post-expiration occurrences. . . .[A]s a former policyholder, Campo would have had to
> *procure* flood insurance.

*See also Id.* ("Even though this is not a matter of initial procurement, the discrete facts of this

case nevertheless demonstrate that it is procurement-related: Allstate's alleged

misrepresentations occurred when Campo's only relationship with Allstate was that of both a

*former* and a *potential future* policyholder.") (emphasis in original). In the case now before the

Court, Standard's reformation of the Plaintiff's policies resulted in no gap in Plaintiff's coverage.

Both Plaintiff and Standard agree that Plaintiff had flood insurance coverage under the NFIP at

the time of all policy renewals and at the time of the loss during Hurricane Sandy. [Berger Aff., ¶

5; Complaint, pg. 4, ¶ 1]. The claim filed by Plaintiff wasn't "fictitious," because it was that of a

present policyholder. Moreover, the reformation of Plaintiff's policies only took effect by action

of regulations governing Plaintiff's SFIPs (the reformation provision in the Manual). Had there

been no SFIP, as was the case in *Campo*, there would have been nothing governed by the Manual

requiring reformation and nothing for Standard to ultimately reform.

Even presuming, *arguendo*, that *Campo* supports the proposition that policy renewals are

acts relating to policy procurement, Plaintiff's argument still fails to acknowledge the subsequent

review of *Campo* and clarification by the Fifth Circuit. That court revisited *Campo* three years

later in *Grissom v. Liberty Mut. Fire Ins. Co.*, 678 F.3d 397 (5th Cir. 2012), clearly enunciating

the test to distinguish between claims handling and policy procurement:

> The key factor to determine if an interaction with an insurer is "claims handling" is the
> status of the insured at the time of the interaction between the parties. If the individual is
> already covered and in the midst of a non-lapsed insurance policy, the interactions
> between the insurer and the insured, including renewals of insurance, are 'claims
> handling' subject to preemption.

*Id.* at 401.[17] The Residences at Bay Point were "covered and in the midst of a non-lapsed

insurance policy" at the time Standard reformed the General Property SFIPs to the RCBAP form,

---

[17] Shortly After the *Campo* decision, FEMA issued a Memorandum expressing its disagreement
with the court's holding. *See* U.S. DEPARTMENT OF HOMELAND SECURITY,
MEMORANDUM WYO PROGRAM BULLETIN W-09038, NOTICE OF FEMA'S INTENT
TO ADOPT BY REGULATION, A CLARIFICATION OF THE CURRENT EXPRESS
PREEMPTION CLAUSE OF THE STANDARD FLOOD INSURANCE POLICY (2009)
available at http://www.nfipiservice.com/stakeholder/pdf/bulletin/w-09038.pdf ("Rather than its
application in *Campo*, federal preemption should apply not just to claims handling activities, but
also to policy administration. Specifically, preemption should apply to the nationally uniform
and FEMA-mandated processes governing policy issuance and the administration of existing
flood policies, including but not limited to rating, renewal, transfer, non-renewal, cancellation, or
reformation. Insurance agent procurement disputes or any allegation of negligence on the part of
the insurance agent related to procurement are not subject to preemption."). The *Grissom* court
took notice of FEMA's response to *Campo*. ("While this memorandum is not controlling,
FEMA's desire to publish such a memorandum less than three months after this court's opinion
in *Campo* indicates the agency's intent that federal preemption apply to renewals of flood
insurance and other activities which occur after the initial policy is procured.") *Id.* at 401 n. 2.

at the time of Plaintiff's flood loss, and at the time of all policy renewals. Thus, according to the Fifth Circuit, the same court whose case law the Plaintiff invokes in support of its claims, the interactions between Standard and Plaintiff fall squarely in the category of claims handling. While the Fifth Circuit's decisions do not bind this Court, I find the analysis in *Grissom* persuasive. Plaintiff's State law tort claims arising from these interactions are accordingly preempted.

The district court cases cited by Plaintiff are consistent with the rule in *Grissom* and provide no support for Plaintiff's claims. In *Williams*, the defendant insurance company (Standard, the defendant in this case) issued an SFIP to plaintiff in the mistaken belief that plaintiff's property lay in an insurable flood zone. After plaintiff's property suffered flood damage, it was revealed that the property was not insurable under the NFIP, and the defendant retroactively revoked the policy, refusing to make payment to plaintiff. The district court found that the misrepresentation of the property's insurability and the retroactive revocation sounded in procurement, not handling, and allowed plaintiff's state law tort claims to go forward. *Williams*, 892 F. Supp. 2d at 622. The facts of *Paladino* are comparable to those in *Williams*. Defendant (again Standard, the same defendant in the present case) retroactively revoked plaintiff's policy after storm damage had occurred, on the grounds that the property was not insurable under the terms of the SFIP. The district court again found that plaintiff's tort claims were not barred. *Paladino*, 616 F. Supp. 2d at 546.

The court that decided *Williams*, while affording little deference to the FEMA Memorandum, acknowledged the holding of *Grissom*. "Unlike the plaintiff in *Grissom*, who had

---

While such an informal policy statement is not binding on this Court, and is not necessary to this Court's decision, the fact that FEMA construes SFIPs to expressly preempt state tort claims arising from reformation and renewal further undermines Plaintiff's arguments to the contrary.

a valid insurance policy at the time of the dispute, plaintiffs in the instant matter allege that they did not have a valid policy because defendant retroactively revoked it." *Williams*, 892 F. Supp. 2d at 626 n. 1. The facts of the case at bar are thus clearly distinguishable from *Williams*. Here, Plaintiff contends that the General Property policies issued on its residential condominium complex were and are valid. While Defendant disagrees with Plaintiff's claim that the policies must be honored as written, it agrees with Plaintiff that all four buildings owned by Plaintiff were covered by an SFIP during the relevant period and that there was no disruption or break in coverage during the entire period in dispute. Accordingly, the facts of *Paladino* are also distinguishable. There, as in *Williams*, both Plaintiff and Defendant agreed that the Plaintiff had no valid SFIP at the time of the events giving rise to the dispute. *Paladino*, 616 F. Supp. 2d at 546. In short, the district courts in this Circuit have consistently applied the rule that the status of the plaintiff's coverage at the time of the adverse interaction with defendant WYO company determines whether a claim arising from that interaction relates to claims handling or policy procurement. This Court finds no reason not to do the same.

All of the decisional law presented, much of it by Plaintiff, suggests that the conduct of Standard in reforming and renewing Plaintiff's policies constitutes claims handling. As the Third Circuit has found SFIP handling claims under state law to be preempted both expressly and on the basis of the conflict between state and federal interests, Plaintiff's New Jersey state law fraud and negligence claims are preempted by the NFIP and are dismissed.

Conclusion

For the foregoing reasons, Defendant Standard Fire Insurance Company's Motion for Summary Judgment is granted in part and denied in part. Judgment is entered for Defendant Standard, dismissing the federal breach of contract claim concerning the SFIPs issued on buildings 9 and 11, as well as Plaintiff's claims under the New Jersey Consumer Protection Act and the state law of negligence. Plaintiff's breach of contract claim concerning the SFIPs issued on buildings 10 and 12 is dismissed without prejudice, with leave granted to Plaintiff to file an amended complaint consistent with this Opinion within twenty (20) days.


Dated: ____12/4/2013__ ____                                    _____/s/ Freda L. Wolfson_____
                                                                                    The Honorable Freda L. Wolfson
                                                                                    United States District Judge