**FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————
                                                      :
THE RESIDENCES AT BAY POINT                           :
CONDOMINIUM ASSOCIATION, INC.,                        :
                                                      :
                         Plaintiff,                   :
                                                      :   Civil Action No. 13-02380 (FLW)(LHG)
              v.                                      :
                                                      :            **OPINION**
THE STANDARD FIRE INSURANCE                           :
COMPANY, *doing business as*                          :
TRAVELERS INDEMNITY AND                               :
AFFILIATES, CHERNOFF                                  :
DIAMOND & CO, LLC, ALBERT J.                           :
DWECK, and THE RESIDENCES AT                          :
BAY POINT, LLC,                                       :
                                                      :
                         Defendants.                  :
———————————————————                                   :


**WOLFSON, United States District Judge:**


         Before the Court is the Motion of Defendant, the Standard Fire Insurance Company

("Standard"), to dismiss certain counts of the Second Amended Complaint of the Residences at

Bay Point Condominium Association ("Plaintiff") for failure to state a claim, pursuant to Federal

Rule of Civil Procedure 12(b)(6), along with the Cross-Motions of both Plaintiff and Defendant,

Chernoff Diamond and Co., LLC ("Chernoff"), for summary judgment in favor of Plaintiff on its

claims against Standard. Plaintiff claims (i) in its Second Cause of Action, that Standard breached

the General Property ("GP") Standard Flood Insurance Policies ("SFIPs") on Plaintiff's Buildings

10 and 12 by reforming those policies to Residential Condominium Building Association Policies

("RCBAPs") in the wake of Hurricane Sandy in October of 2012, because neither building was

"residential" under the terms of the SFIPs; (ii) in its Third Cause of Action, that Standard breached

the reformed RCBAP SFIPs on all four of Plaintiff's buildings by applying coinsurance penalties, because Plaintiff carried the "maximum amount of insurance coverage available" under its original GP SFIPs and/or under its reformed RCBAP SFIPS; and (iii) in its Fourth Cause of Action, that Standard breached the reformed RCBAP SFIPs on all four of Plaintiff's buildings by denying Plaintiff the opportunity to purchase additional coverage after the flood loss.

For the reasons set forth below, this Court concludes that, under the National Flood Insurance Program ("NFIP"), of which all SFIPs are a part, (i) "residential" means designed for principal use as a dwelling place, (ii) "maximum amount of insurance coverage available" means the maximum amount of insurance coverage legally available to a property owner before the occurrence of a flood-related loss, and (iii) no provision of the NFIP allows for the purchase of insurance coverage after a flood loss. Accordingly, the Court grants Standard's Motion and dismisses the Second, Third, and Fourth Causes of Action in the Second Amended Complaint. The Cross-Motions for Summary Judgment of Plaintiff and Chernoff are denied as moot.


I. BACKGROUND OF THE NATIONAL FLOOD INSURANCE PROGRAM


Congress passed the National Flood Insurance Act ("NFIA") to "limit the damage caused by flood disasters through prevention and protective measures," namely through the creation of a comprehensive, federally-run system of flood insurance. *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 165 (3d Cir. 1998). The NFIA entrusted the Federal Emergency Management Agency ("FEMA") with the administration of the NFIP and funded the NFIP through the National Flood Insurance Fund, located in the United States Treasury and overseen by FEMA. *Id*. at 165 n. 2. The NFIA further authorized FEMA to "prescribe regulations establishing the general method

or methods by which proved and approved claims for losses may be adjusted and paid for any damage to or loss of property which is covered by insurance." 42 U.S.C. § 4019. The resulting regulatory scheme, promulgated by FEMA, can be found in 44 C.F.R. §§ 61.1-78.14. Because the NFIP is a completely federally funded and administered program, states have no regulatory control over the NFIP's operations. *Linder & Assocs. Inc. v. Aetna Cas. & Sur. Co.*, 166 F.3d 547, 550 (3d Cir. 1999) ("It is well settled that federal common law governs the interpretation of [NFIP policies]. Accordingly, neither the statutory nor decisional law of any particular state is applicable to the case at bar. . . . [W]e interpret the [policy] in accordance with its plain, unambiguous meaning, remaining cognizant that its interpretation should be uniform throughout the country and that coverage should not vary from state to state.")(quotations omitted).

Pursuant to another part of the NFIA, 42 U.S.C. § 4081(a), FEMA created the "Write-Your-Own" ("WYO") Program whereby SFIPs may be issued by private insurance companies like Standard ("WYO companies"). Though FEMA may issue SFIPs directly, "more than 90% are written by WYO companies. These private insurers may act as 'fiscal agents of the United States,' 42 U.S.C. § 4071(a)(1), but they are not general agents. Thus they must strictly enforce the provisions set out by FEMA and may vary the terms of [an SFIP] only with the express written consent of the Federal Insurance Administrator. 44 C.F.R. §§ 61.4(b), 61.13(d) & (e), 62.23(c) & (d). In essence, the insurance companies serve as administrators for the federal program. It is the Government, not the companies, that pays the claims. And when a claimant sues for payment of a claim, 'the responsibility for defending claims will be upon the Write Your Own Company and defense costs will be part of the ... claim expense allowance' [reimbursed by the government]. 44 C.F.R. § 62.23(i)(6)." *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 267 (3d Cir. 2004).

Private insurers participating in the WYO Program are authorized to issue policies under a number of different forms of the SFIP. Which SFIP form is used to insure a property is determined by the type of the insured property's intended occupancy. *See* FEMA National Flood Insurance Manual, GR 5, III, D, effective May 1, 2011, available at http://www.fema.gov/flood-insurance-manual/flood-insurance-manual-effective-may-1-2011 (hereinafter "Manual"). For an example relevant to this case, the General Property form of the SFIP is used for apartment buildings, while the Residential Condominium Building Association Policy ("RCBAP") form of the SFIP is used for residential condominium buildings. 44 C.F.R. § 61, app. A(2)-(3). Other than the type of building each insures, the other primary difference between the different forms of the SFIP is the type of compensation and coverage available after a qualifying flood loss has occurred. The General Property form provides flood insurance coverage on an Actual Cash Value ("ACV") basis. Under ACV policies, insureds are compensated for the cash value of lost or damaged property at the time of the flood loss, up to the total amount of ACV insurance purchased and subject to any deductible on the policy. [RCBAP SFIP, 17; 44 C.F.R. § 61, app. A(3)(V)(4)]. The RCBAP form, by contrast, provides coverage on a Replace Cost ("RC") basis. Under RC policies, insureds are compensated for the cost to replace lost or damaged property with new versions of the same or substantially similar property at the time of the loss, again up to the total amount of the RC insurance purchased and subject to any deductible, but also subject to "coinsurance penalties" unique to the RCBAP policy. Because FEMA wished to encourage condominium owners insuring their properties under the RCBAP form to carry adequate insurance to replace all or substantially all of the damaged property, it added "coinsurance penalties" or "copays" to the RCBAP SFIP, whereby policyholders who purchased insurance for less than 80% of the replacement value of the insured property would suffer reductions in the payouts of their policies. [RCBAP SFIP, 10; 44

C.F.R. § 61 app. (A)(3)(VII)]. The dispute presently before the Court arises out of the different eligibility requirements and methods of compensation provided by the General Property and RCBAP forms of SFIPs.

## II. FACTUAL BACKGROUND

This Court extensively discussed the facts of this case in its Opinion dated December 4, 2013. In that Opinion, the Court decided Standard's Motion for Partial Summary Judgment, and was called upon to rely on facts outside of the Complaint, which were submitted by the parties in supplementary affidavits and declarations. In considering Standard's present Motion to Dismiss the Second Amended Complaint, however, this Court relies exclusively upon those facts articulated within the Second Amended Complaint itself. Although both the parties and the Court are, by this time, intimately familiar with the facts surrounding this dispute, those facts relevant to the present Motion are as follows.

At some point prior to the year 2012, Plaintiff, through its broker Defendant Chernoff Diamond & Co., LLC, secured four SFIPs underwritten as part of the WYO Program of the NFIP by Defendant Standard. [Second Amended Complaint, hereinafter "SAC," p. 5, ¶ 13].[1] All four policies were written onto the GP form of the SFIP. [SAC, p. 5, ¶ 14]. Each policy provided $250,000 of flood insurance coverage to a different one of the buildings in Plaintiff's "residential condominium complex." [SAC, p. 3, ¶ 4; p. 5, ¶ 14]. In October of 2012, all four of Plaintiff's

---

[1] The Second Amended Complaint is consecutively paginated, but restarts the numbering of paragraphs in each new section. Accordingly, both the page number and paragraph number are provided in citations to the Complaint.

buildings suffered flood damage as a result of Hurricane Sandy. [SAC, p. 5, ¶ 13]. Plaintiff submitted a timely insurance claim on all four of its GP SFIPs. [SAC, p. 6, ¶ 16].

After reviewing Plaintiff's claims, Standard reformed all four of Plaintiff's GP SFIPs, rewriting them onto RCBAP forms, reasoning that Plaintiff's buildings were in fact "residential condominiums" under the NFIP at the time of Plaintiff's last policy renewal and of the flood loss. [SAC, p. 6, ¶ 17]. Standard, applying the provisions of the reformed RCBAP SFIPs, then applied coinsurance penalties to the claims made on each of Plaintiff's buildings because Plaintiff's $250,000 of reformed RCBAP coverage per building was less than 80% of the replacement value of each building. Standard reduced Plaintiff's insurance claims by $361,696.87 and offered to pay $221,131.24 in full satisfaction of Plaintiff's claims. [SAC, pp. 6-7, ¶¶ 19-20]. Plaintiff disputed Standard's adjustment of its claims, and filed suit. Since the filing of the original Complaint in this action, Standard has paid Plaintiff $221,131.24 on its reformed RCBAP SFIPs. [SAC, p. 7, ¶ 22].


III. PROCEDURAL HISTORY


Plaintiff commenced this action by a Complaint on April 10, 2013, naming the Standard Fire Insurance Company and Chernoff Diamond & Co., LLC as defendants. On May 14, 2013, Standard responded by filing a pre-Answer Motion to Dismiss all claims against it pursuant to Rule 12(b)(6). Chernoff Answered the Complaint on June 10, 2013, and, shortly thereafter, on June 17, filed a Response in Opposition to Standard's Motion. Plaintiff also submitted its Response in Opposition to the Motion on June 17. Standard filed its Reply to both Oppositions on July 29, 2013. Along with their Opposition papers, both Plaintiff and Chernoff submitted affidavits and other evidence not contained within the Complaint, along with a request that Standard's Motion

be treated as one for Summary Judgment under Rule 56. Standard, in its Reply, agreed that the Motion should be converted. Accordingly, the Court, pursuant to Rule 12(d), converted Standard's Motion to one for Summary Judgment on October 9, 2013, simultaneously also granting Plaintiff's request to supplement the record. Plaintiff filed its supplementary Reply brief on October 24. Standard responded with a request to file a Sur-Reply on October 28, which was granted by the Court. Standard filed its Sur-Reply on November 6, 2013, completing briefing on the converted Motion for Summary Judgment.

On December 4, 2013, this Court issued its Opinion on Standard's initial Motion. The Court dismissed, with prejudice, Plaintiff's federal breach of contract claim concerning the reformation of the SFIPs issued on Plaintiff's Buildings 9 and 11. The Court then dismissed, without prejudice, Plaintiff's federal breach of contract claim concerning the reformation of the SFIPs issued on Plaintiff's Buildings 10 and 12. The Court also dismissed, with prejudice, all of Plaintiff's state law claims against Standard. Acknowledging the novel legal arguments introduced by both parties in briefing, and in light of the significant additional factual matter produced, the Court granted Plaintiff leave to amend its Complaint to claim (i) that reformation of the GP SFIPs issued on Buildings 10 and 12 was improper because these buildings were not "residential condominiums" as defined under the NFIP, and (ii) that, even if reformation of all four of Plaintiff's SFIPs was appropriate, Standard should not have applied coinsurance penalties to Plaintiff's insurance claims because Plaintiff held the "maximum amount of insurance available" under the NFIP.

Plaintiff filed an Amended Complaint on December 24, 2013, in which it raised these arguments in three separate causes of action. Plaintiff claims (i) in its Second Cause of Action, that Standard breached the General Property ("GP") Standard Flood Insurance Policies ("SFIPs") on

7

Plaintiff's Buildings 10 and 12 by reforming those policies to Residential Condominium Building Association Policies ("RCBAPs") in the wake of Hurricane Sandy in October of 2012, because neither building was "residential" under the terms of the SFIPs; (ii) in its Third Cause of Action, that Standard breached the reformed RCBAP SFIPs on all four of Plaintiff's buildings by applying coinsurance penalties, because Plaintiff carried the "maximum amount of insurance coverage available" under its original GP SFIPs and/or under its reformed RCBAP SFIPS; and (iii) in its Fourth Cause of Action, that Standard breached the reformed RCBAP SFIPs on all four of Plaintiff's buildings by denying Plaintiff the opportunity to purchase additional coverage after the flood loss.

On January 14, 2014, Plaintiff was granted leave to file and did file a Second Amended Complaint, with claims against Standard identical to those raised in the Amended Complaint, but adding claims against additional defendants, Albert J. Dweck, and the Residences at Bay Point LLC. Standard moved to dismiss the Second Amended Complaint on January 31. Plaintiff opposed Standard's Motion and filed its own Cross-Motion for Summary Judgment on all three of its breach of contract claims against Standard on March 17, 2014. On the same day, Defendant Chernoff also filed an Opposition to Standard's Motion and made its own Cross-Motion for Summary Judgment in favor of Plaintiff on all three of Plaintiff's claims against Standard. Mr. Dweck and the Residences at Bay Point LLC joined in Plaintiff's and Chernoff's Motions by letter brief.  The Motion and Cross-Motions were subsequently fully briefed and are now before the Court.

IV. STANDARD OF REVIEW

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149–50 n. 3 (1984) (quotation and citation omitted). A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" *Bell Atlantic v. Twombly*, 550 U.S. 544, 583 (2007) (quoting *Scheuer v. Rhoades*, 416 U.S. 232, 236 (1974)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for all civil actions.") (internal citations omitted); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("*Iqbal* . . . provides the final nail-in-the-coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly.*").

Following the *Twombly/Iqbal* standard, the Third Circuit applies a two-part analysis in reviewing a complaint under Rule 12(b)(6). First, a district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Fowler,* 578 F.3d at 210. Second, a district court must determine whether the facts alleged in the complaint are sufficient to

show that the plaintiff has a "plausible claim for relief." *Ibid*. A complaint must do more than allege the plaintiff's entitlement to relief. *Ibid.*; *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (stating that the "Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."). A court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997). The defendant bears the burden of showing that no claim has been presented. *Hedges v. U.S.*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). Finally, a court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. *Southern Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

Because this Court decides Standard's Motion to Dismiss all three claims against it on purely legal grounds, no evaluation of the Cross-Motions of Plaintiff and Chernoff under the summary judgment standard is required.

## V. JURISDICTION

Congress has vested the United States District Courts with exclusive and original jurisdiction over federal law contract claims arising from the adjustment of polices issued under

Part B of the NFIP. *Van Holt*, 163 F.3d at 167 ("42 U.S.C. § 4072 vests district courts with original exclusive jurisdiction over suits by claimants against WYO companies based on partial or total disallowance of claims for insurance arising out of the National Flood Insurance Act."). All three of Plaintiff's claims against Standard allege breach of federally authorized SFIPs, granting this Court jurisdiction pursuant to 42 U.S.C. § 4072. This Court has supplemental jurisdiction over Plaintiff's New Jersey Consumer Fraud Act and common law claims pursuant to 28 U.S.C. §1367.


VI. COVERAGE UNDER THE GP POLICIES OF BUILDINGS 10 AND 12


Each SFIP in this case defines a "Residential Condominium Building" as a "building, owned and administered as a condominium, containing one or more family units and in which at least 75 percent of the floor area is residential." [GP SFIP, II(B)(25); 44 C.F.R. § 61 app. (A)(2)(II)(B)(25); *Accord* RCBAP SFIP, II(B)(25); 44 C.F.R. § 61 app. (A)(3)(II)(B)(25)]. The parties do not dispute that all four of Plaintiff's buildings in this case were held in the condominium form of ownership and contained one or more family units at the time of the flood loss. Additionally, this Court has already ruled for the reasons stated in the Opinion filed on December 4, 2013, that Buildings 9 and 11 indisputably qualified as residential condominium buildings under the SFIP at the time of the flood loss. The only question remaining before this Court as to whether Standard was required to honor Plaintiff's coverage under any of its GP SFIPs, therefore, is whether, "at least 75 percent of the floor area" of buildings 10 and 12 was "residential" during the coverage period. Complicating the Court's task in this regard is the fact that the term "residential" is nowhere independently defined in either form of the SFIP, nor is it defined in any of the applicable NFIP regulations. The term "residential" is, however, mentioned at several other points

11

in the SFIP and Manual, from which the Court can glean the clear, unambiguous meaning of the term.

Plaintiff contends that, under the SFIP, 75 percent of the floor area being "residential" means that 75 percent of the floor area of a given condominium building is currently occupied as residences. In support of its contention, Plaintiff relies upon the Condominium Underwriting Guidelines set forth in the FEMA Flood Insurance Manual ("the Manual"). Those Guidelines provide that the General Property Form may be used for a "[c]ondominium building in a regular program community with less than 75% of its floor area in residential use." Manual, CONDO 2, Table 1.[2] "In residential use," according to the Plaintiff, necessarily means that the floor area must be in active use by occupants. Accordingly, if a given condominium unit, which is admittedly designed as a dwelling place or residence, is vacant at the time flood insurance is sought or a loss is suffered, Plaintiff argues that the floor space of that unit should not count as "residential" in determining eligibility for the GP SFIP.

Defendant proposes a different interpretation of what it means when, in a building, "at least 75 percent of the floor area is residential." Defendant, relying on the "Determination of Building Occupancy" subsection of the General Rules Chapter of the Manual, contends that "residential" means designed for principal use as a dwelling place. There are only four types of occupancy classifications provided for by the Manual. The parties agree that the buildings in Plaintiff's condominium complex are neither of the two categories of family dwellings defined. Accordingly, Standard argues that Plaintiff's buildings must be one of the two remaining categories, either "Other Residential Building" or "Non-Residential Building." Specifically, Standard contends that

---

[2] The Manual is very clear that the underwriting guideline relied upon by Plaintiffs is not be read in isolation. "These are basic guidelines for condominium associations and unit owners. Please refer to appropriate section of this manual for specific details." CONDO 2 Table 1 n. 1.

Plaintiffs' buildings are "Other Residential Buildings" defined as "residential building[s] that contain[] more than 4 apartments/units. [Manual, GR 6, III(D)(3)]. Standard explains that the strict division between "residential" and "non-residential" buildings indicates that under the NFIP it is the intended use of a given floor area, or rather the use for which that area is designed which defines its occupancy. Finally, Standard relies on the fact that Plaintiff has provided no statutory, regulatory, or other legal support for its reading of "non-residential" floor space to include vacant spaces designed for and intended to be used as residences.

Beginning its analysis, the Court reiterates that "[i]t is well settled that federal common law governs the interpretation of [SFIPs]" and we must interpret these policies "in accordance with [their] plain, unambiguous meaning, remaining cognizant that its interpretation should be uniform throughout the country and that coverage should not vary from state to state." *Linder & Assocs. Inc. v. Aetna Cas. & Sur. Co.*, 166 F.3d 547, 550 (3d Cir. 1999). The Court notes that all of the questions presented by the present motions are issues of first impression in this Circuit. It does not appear that any Court has been called upon to address the definition of the disputed terms under the NFIP, most likely, in this Court's estimation, because the clear and unambiguous meaning of these terms is such that no party has yet sought to raise arguments under them. In any event, the parties have cited no specific law interpreting the term "residential," and this Court has identified none. Reviewing the terms of the GP SFIPs issued on buildings 10 and 12, along with the terms of the RCBAP SFIP and the surrounding federal regulations governing those policies, this Court concludes that "residential" means "designed for principal use as a dwelling," and properly characterizes a given area of floor space, regardless of whether that space is presently occupied.

As a threshold matter, the Court observes the absurd results of considering a vacant condominium residence as "non-residential" floor space for the purposes of the SFIP. Under

Plaintiff's proposed reading of the SFIP, a condominium building of 100 equally sized units in which 75 have been purchased and occupied by their owners and 25 remain unsold and vacant would be properly insured under the RCBAP form of the SFIP as having at least 75% of the floor area in residential use. If, however, during the term of the insurance policy on the building, one of the owner-occupiers put his or her unit up for sale and vacated the premises, the percentage of the floor area "in residential use" would drop below 75% and the entire building would have to be reclassified as non-residential under the NFIP. The RCBAP SFIP on the building would then have to be reformed to a GP SFIP. If, a week later, that owner-occupier changed his or her mind and reoccupied the premises, removing the unit from the market, the building would once again have at least 75% of its floor area in residential use and need to be classified as a residential condominium. The building's flood insurance policy would once again have to be reformed from the GP form of the SFIP back to the RCBAP form. This simply cannot be how the NFIP was designed to operate, and this Court finds that it is not.

The Court now turns to the specific language in the NFIP which makes it clear that Plaintiff's proposed definition is untenable. Firstly, the Court observes that throughout the SFIPs and the Manual there is a strict dichotomy between "residential" and "commercial" space. The NFIP seems to contemplate that all spaces must be one or the other, and makes no provision for any third category. There are, for example, only two ways for a Condominium association to insure its property under an SFIP. CONDO 1 I. "A condominium association may purchase insurance coverage on a residential building and its contents under the RCBAP. The RCBAP covers only a residential condominium building in a Regular Program community." CONDO 1 I(A). Alternatively, "[n]on-residential (commercial) condominium buildings and their commonly owned contents may be insured in the name of the association under the General Property Form.

The 'non-residential' limits apply." Non-Residential (Commercial) Condominium: Building and Contents, CONDO 1 I(C) (parenthetical in original). The section of the Manual devoted to the "Determination of Building Occupancy" explicitly defines an "Other Residential Building" as "a residential building that contains more than 4 apartments/units" and a "Non-Residential Building" as "a commercial or non-habitional building, or a mixed-use building that does not qualify as a residential building."

At first glance the poor drafting of these definitions, particularly that of residential buildings appears somewhat tautological. Read in conjunction, however, the definitions in the Determination of Building Occupancy subsection of the Manual give a clear picture of three different categories of "use:" "residential," "commercial/non-habitional," or "mixed-use." These categories are in turn derived from the same dichotomy between the two types of occupancy: "residential" and "commercial." Condominium buildings where the entire floor area is in "residential use" must clearly be insured under the RCBAP form of the SFIP. Similarly, condominium buildings in which the entire floor area is in "commercial/non-habitational" use must be insured under the GP form of the SFIP. Giving the term "mixed-use" its plain meaning, the Court finds that "mixed-use" refers to a building in which some of the floor area is "residential" and some is "commercial/non-habitational." The Manual clearly provides that a space must be either one category or the other. It cannot be both, and it cannot be neither.

Plaintiff cannot and does not argue that all of the floor area of its buildings was commercial/non-habitational, so the only way in which it could be entitled to coverage under the GP form is if the buildings were "mixed-use." Plaintiff alleges that 50% of Building 10 and 65.9% of Building 12 were "occupied as residential." Pg 9, paragraphs 32-33. The remainder of the space was vacant. *Ibid.* As a threshold matter, vacant space is clearly not commercial space and this

Court does not understand Plaintiff to be arguing as such. While it might at first seem a closer question, it seems equally clear to this Court that vacant space is not "non-habitational." This Court reads "non-habitional" to mean not designed or intended for use as a dwelling place. This reading of the term distinguishes whether a space is "habitational" from whether the space is "inhabited." The Court finds this reading compelled in the condominium context by the dichotomy between residential and commercial space found throughout Manual. It is not possible that a residential space could be reclassified as a commercial space merely by becoming vacant.

More directly on point is another note to the set of tables cited by Plaintiff for its definition of "residential use." The note provides, "[w]hen there is a mixture of residential and commercial usage within a single building, refer to subsection D. Determination of Building Occupancy in the General Rules section of this manual." CONDO 4 Table 2 Note 2. Accordingly, the very source of Plaintiff's definition of "residential use" reinforces the strict dichotomy between residential and commercial usage. There is no room left for a category of space designed for residential, but which is currently uninhabited.

The definition of a residential building itself supports the conclusion that no room is left within the SFIPs definitions for Plaintiff's proposed occupancy classification. The Manual states of "Other Residential Building[s]" that "[t]his category includes condominium and apartment buildings as well as hotels, motels, tourist homes, and rooming houses where the normal occupancy of a guest is 6 months or more. These buildings are permitted incidental occupancies. . . The total area of incidental occupancy is limited to less than 25% of the total floor area within the building." Determination of Building Occupancy GR 6 III(D)(3). In turn, "[i]ncidental occupancies are offices, private schools, studios, or small service operations within a residential building." GR 6 III(D)(1). The elaboration of these incidental occupancies helps flesh out the

category of commercial/non-habitational spaces that may be present in an otherwise residential building. Any mention of vacant space is noticeably absent.

Other sections of the Manual clearly evidence the unworkability of Plaintiff's definition. For example, "[r]esidential condominium buildings that are being used as a hotel or motel, or are being rented (either short or long term), must be insured under the RCBAP." CONDO 5 III(A)(2). If vacancy of a unit resulted in the reclassification of the floor space as "non-residential," the operation of a hotel in a residential condominium could continually result in the voiding of the condominium's flood insurance policy. When a last critical guest checked-in for his or her six-month stay, increasing the occupancy of the building's residential floor area above 75%, the RCBAP form the SFIP would be in force. When that guest or any of the others checked-out, leaving a unit vacant and reducing the residential floor area below 75%, the GP form of the SFIP would be required and the RCBAP form voided and reformed. The condominium association would need to be in continuous contact with its broker and insurance company to keep up with the rapid changes in the building's occupancy classification as various guests checked-in and others checked-out.

Similarly, "[t]he NFIP rules allow the issuance of an [RCBAP] SFIP to cover a building in the course of construction before the building is walled and roofed. . . . The policy is issued and rated based on the construction designs and intended use of the building." CONDO 5 III(B). Barring illegal occupancies, condominiums without walls and roofs are by definition vacant, and would be required under Plaintiff's definition to make use of the GP SFIP. The Manual clearly disclaims such an understanding, reinforcing the basic tenets that eligibility for the RCBAP depends upon being held in the condominium form of ownership and having over 75% of the floor area intended for residential use.

Having concluded that Buildings 10 and 12 were residential condominiums at the time of the flood loss, this court applies the same law enunciated in its December 4, 2013 Opinion, and finds that Standard was legally obligated to reform the GP SFIPS issued on Buildings 10 and 12 to the correct RCBAP form of the SFIP. It is indisputable that the General Property SFIPs do not provide coverage for "residential condominiums." [General Property SFIP, 1 ("THIS POLICY PROVIDES NO COVERAGE . . . FOR A RESIDENTIAL CONDOMINIUM BUILDING, AS DEFINED IN THIS POLICY") (emphasis in original); 44 C.F.R. § 61 app. (A)(2); *id.* at IV, ¶ 17 ("PROPERTY NOT COVERED: A **residential condominium building**.") (emphasis in original)]. Residential condominiums are defined in all SFIPs as buildings held in the condominium form of ownership where more of than 75% of the floor area is residential. [General Property SFIP, II, ¶ 25; 44 C.F.R. § 61 app. (A)(2)(II)(25); *accord* RCBAP SFIP, II, ¶ 25; 44 C.F.R. § 61 app. (A)(3)(II)(25)].

Firstly, the Third Circuit has explicitly recognized that following the guidance of the Flood Insurance Claims Manual is mandatory for WYO companies like Standard. *Suopys v. Omaha Property & Cas.*, 404 F.3d 805, 811 (3d Cir. 2005) ("FEMA's regulations are controlling regarding the application of the SFIP by WYO Companies. 44 C.F.R. Pt. 61, App. A(1). The FEMA Claims Manual . . . is incorporated by reference into the FEMA regulations (44 C.F.R. § 62.23)."). *See also id.* at 807:

> WYO Companies are bound to adjust claims in accordance with the terms of the SFIP. The SFIP requires that in adjusting claims, the WYO Company apply its own company standards *guided by NFIP Claims manuals issued by FEMA*. 44 C.F.R. § 62.23(i)(1) (2003). WYO carriers may not alter, amend, or waive any provision or condition of the SFIP absent express written consent from the Federal Insurance Administrator. 44 C.F.R. Pt. 61, App. (A)(1), Art. 9(D)(2000)/ Art. VII(D) (2003); 44 C.F.R. § 61.13(d) (2003).

(emphasis added). Secondly, this Court finds that the note in Manual, GR 12, IX, D, directly applies to the situation at bar:

**D. Reduction of Coverage Limits or Reformation**
. . . **NOTE**: When coverage is issued using an incorrect SFIP form, the policy is void and the coverage must be written under the correct form. The provisions of the correct SFIP form apply. The coverage limits must be reformed according to the provisions of the correct SFIP form and cannot exceed the coverage limits originally issued under the incorrect policy.

As explained, *supra*, buildings 10 and 12 were residential condominiums during their period of coverage. The General Property form does not provide coverage for residential condominiums. The two policies, were, accordingly, "issued using an incorrect SFIP form." The coverage therefore had to be rewritten onto the correct form. RCBAP policies are the only SFIPs providing coverage to residential condominium buildings, and, accordingly, the RCBAP form was the correct one in this case. Standard thus complied with the terms of the Manual when it reformed Plaintiff's policies on Buildings 10 and 12. Plaintiff's federal breach of contract claim on the basis of the 2012 reformation of the buildings' SFIPs is dismissed with prejudice.

## V. APPLICATION OF THE COINSURANCE PENALTIES UNDER THE REFORMED RCBAP SFIPS

As discussed, *supra*, the insurance policies on all four of Plaintiff's buildings in this case were properly reformed to the RCBAP form of the SFIP. The RCBAP form, unlike the original GP form under which Plaintiff attempted to secure coverage, imposes a "coinsurance penalty" on loss payments "unless the amount of insurance applicable to the damaged building is: (1) [a]t least 80 percent of its replacement cost; or (2) [t]he maximum amount of insurance available for that building under the NFIP, whichever is less." 44 C.F.R. § 61 app. A(3) (VII) (B) (2009). When a coinsurance penalty is applied, the insured party does not receive the full dollar value of the insurance it purchased. Instead, as described above, it receives the value of its covered claim less

the coinsurance penalty.

In this case, Plaintiff purchased GP SFIPs for each of its four buildings at $250,000 in insurance coverage per building. After Plaintiff's claim, Standard, acting in accordance with the Manual, reformed each of Plaintiff's four GP SFIPs to RCBAP SFIPs at $250,000 in insurance coverage per building. Manual, GR 12, IX(D), requires that reformed policies be rewritten at the same coverage limits as the incorrect policies they replace. Because Plaintiff's original GP SFIPs provided for $250,000 of coverage each, the new RCBAP policies on Plaintiff's buildings also provided for $250,000 in coverage. It is undisputed that at the time of Plaintiff's last policy renewal and at the time of the flood loss, each of the four insured buildings was valued at a replacement cost of $1 million. Accordingly, when the policies were reformed to the RCBAP form of the SFIP, the $250,000 in coverage on each building constituted coverage for 25% of the replacement cost of each of the buildings. This was well below 80% of their $1 million replacement value. Standard therefore applied coinsurance penalties to Plaintiff's claims and withheld $361,696.87 of Plaintiff's claimed losses.

Plaintiff concedes that the coverage it purchased was less than 80% of each of the buildings' replacement costs. Instead, Plaintiff argues that the coinsurance penalties should not have been applied because Plaintiff purchased for each building the "maximum amount of insurance available under the NFIP." Plaintiff and Chernoff present two alternative theories for how Plaintiff purchased the "maximum amount of coverage available." First, they contend that when Plaintiff purchased flood insurance on its buildings under the GP form of the SFIP, the maximum amount of insurance available for each building, under the GP form, was $250,000. Accordingly, by purchasing $250,000 worth of coverage on each building under the GP form of the SFIP, Plaintiff purchased "the maximum amount" available, and this should have been honored

even after reformation.[3] Second, Plaintiff and Chernoff seize upon Manual, GR 12, IX(D), and argue that because the coverage limits of Plaintiff's reformed RCBAP policies could not legally be higher than those it had on its GP SFIPs, the $250,000 of coverage Plaintiff has on its reformed policies is the maximum amount of insurance "available" to Plaintiff under the NFIP.

As a threshold matter, Plaintiff argues that both of its theories are supported by the principle that when there are ambiguities in an insurance contract and multiple constructions are possible, courts must adopt the construction which is most favorable to the insured party. *Linder & Assocs. v. Setna Cas. & Sur. Co.*, 166 F.3d 547, 550 (3d Cir. 1999). Plaintiff contends that the coinsurance provision of the RCBAP SFIPs is ambiguous, and thus should be construed in Plaintiff's favor. In other words, because there is at least one constructions of the "maximum amount of insurance available . . . under the NFIP" which precludes the application of coinsurance penalties in this case, Plaintiff contends they should not be applied. Standard, in response, contends firstly that the coinsurance provision is unambiguous and clearly applied to the facts of this case, and secondly that the doctrine of *contra proferentum* does not apply in cases arising under the NFIP, and therefore, even if the coinsurance provision were ambiguous Plaintiff would not be entitled to have

---

[3] The Court notes that this line of argument in support of the Third Cause of Action of the Second Amended Complaint is inconsistent with the Second Cause of Action of the Second Amended Complaint. In the Second Cause of Action, Plaintiff argues that two of its four buildings were not "residential condominiums" as defined under the NFIP because less than 75% of their floor area was occupied as "residential" at the time of renewal and of flood loss. In the Third Cause of Action, Plaintiff argues that the $250,000 of coverage it purchased under the GP form of the SFIP was the "maximum amount" of coverage available to it under that form. $250,000 is the coverage limit for *residential* buildings under the GP form of the SFIP (those where at least 75% of the floor area is residential). [Manual Ratings 1 I]. The coverage limit for non-residential condominium buildings under the GP form of the SFIP is $500,000. [Manual Ratings 1 I]. If, as Plaintiff asserts in Count II, buildings 10 and 12 were not residential, then Plaintiff by definition did not have the maximum amount of coverage available under the GP SFIP. The Court has, however, already ruled that all four of Plaintiff's buildings were residential condominiums, and only draws attention to this inconsistency because Plaintiff did not clearly delineate these arguments as raised in the alternative.

it construed in Plaintiff's favor. *Jacobson v. Metropolitan Property & Casualty Insurance Co.*, 672 F.3d 171 (2d Cir. 2012).

This Court is not called upon to resolve the question of whether ambiguities in an SFIP should be construed in a plaintiff's favor, because the Court finds the coinsurance provision of the RCBAP SFIPs in this case to be clear and unambiguous. In the context of the NFIP, courts give effect to the "[c]lear policy language," and refrain from "tortur[ing] the language to create ambiguities." *Selko v. Home Ins. Co.*, 139 F. 3d, 152 n.3 (3d Cir. 1998); *See also Suopys v. Omaha Prop. & Cas.*, 404 F.3d 805, 809 (3d Cir. 2005) (courts should construe each term of the SFIP "in accordance with its plain, unambiguous meaning").

Returning to Plaintiff's arguments, Plaintiff first contends that by having the maximum amount of coverage available under the GP Form of the SFIP, Plaintiff should have been exempt from the application of coinsurance penalties after reformation to the RCBAP SFIP. This Court disagrees. This Court has already determined that all four of Plaintiff's buildings were residential condominiums within the definition of the NFIP. Accordingly, the only form under which these buildings could be insured was the RCBAP. The GP form of the SFIP, along with its maximum of $250,000 in insurance coverage was, therefore, never legally "available" to Plaintiff. Plaintiff had no legal entitlement to select the GP form of coverage for which its buildings were ineligible. Whether Plaintiff selected the maximum amount of coverage possible under an unavailable form of the SFIP, accordingly, is irrelevant to whether Plaintiff held the "maximum amount of insurance available . . . under the NFIP." For insurance to be "available" under the NFIP, it necessarily had to be legally available.

Plaintiff's second theory requires more analysis. The provision in the Manual requiring reformation is indeed part of the NFIP. Accordingly, it is not, as Standard argues, immediately

untenable for Plaintiff to claim that it had the maximum amount of coverage available under Manual, GR 12, IX(D), which provides:

> **D. Reduction of Coverage Limits or Reformation**
> . . . **NOTE**: When coverage is issued using an incorrect SFIP form, the policy is void and the coverage must be written under the correct form. The provisions of the correct SFIP form apply. The coverage limits must be reformed according to the provisions of the correct SFIP form and cannot exceed the coverage limits originally issued under the incorrect policy.

The coverage limits for the RCBAP form are found at CONDO 6 IV(B), and provide in relevant part that "the maximum *building* coverage that can be purchased on a high-rise or low-rise condominium is the Replacement Cost Value (RCV) of the building or the total number of units in the condominium building times $250,000, whichever is less." Accordingly, Manual, GR 12, IX(D) provides that these coverage limits apply to Plaintiff's policies but "cannot exceed the coverage limits originally issued under the incorrect policies," in this case the coverage limits imposed by the GP form of the SFIP. The parties agree that, under the GP form, the coverage limits for Plaintiff's buildings were $250,000 per building. This figure is less than the maximum coverage limits allowed by the RCBAP, and accordingly, by action of Manual, GR 12, IX(D), all four policies were reformed to RCBAP coverage at the lower GP coverage limit of $250,000. Plaintiff now contends that because $250,000 was the coverage limit of its reformed policies, $250,000 was the maximum amount of coverage "available" to Plaintiff under the NFIP. This Court disagrees.

The Court has already held that for coverage to be "available" under the NFIP it must be legally available — Plaintiff's buildings must have been eligible for the coverage under the terms of the NFIP. The Court now holds that for coverage to be "available" under the NFIP it must also be available at the time of policy origination or renewal, not after a flood loss. It is axiomatic that an entity may not purchase federal flood insurance for a property during or after they have suffered

a flood loss to that property. [RCBAP SFIP, V(B) ("We do not insure a loss directly or indirectly caused by a flood that is already in progress at the time and date: 1. The policy term begins; or 2. Coverage is added at your request;" 44 C.F.R. § 61 app. (A)(3)(V)(B)]. Accordingly, after a flood loss has occurred, no amount of insurance on the damaged property is "available" to a property owner, meaning he or she cannot at that point secure insurance on the property. Instead, the moment of availability occurs earlier, before the property has suffered any flood damage. At that point, assuming the property meets the NFIP's eligibility requirements, coverage for the property under the appropriate SFIP is legally available to the property owner, meaning he or she can select and purchase the insurance. Reformation, as in this case, occurs after a flood loss has occurred. Which coverage limit applies after reformation, therefore, has nothing to do with the "availability" of insurance. It only impacts the amount of coverage actually retained under previously purchased policies.

This point is best illustrated by describing the situation if Plaintiff's interpretation were to prevail. According to Plaintiff, a condominium association with residential buildings has two choices if it desires $250,000 in replacement cost coverage on each of its four $1 million buildings. First, It may purchase coverage under the legally available RCBAP policy, and, in the event of a flood loss, be subject to coinsurance penalties. Alternatively, it may purchase coverage under the GP policy for which it is ineligible, and, if undiscovered until the time of flood loss, have its policies reformed to RCBAP policies after the loss pursuant to Manual GR 12, IX(D), yet enjoy replacement cost coverage without reductions for coinsurance penalties. Nothing in the plain language of the RCBAP or of Manual GR 12, IX(D), suggests that this latter result was intended, or indeed possible.

VI. ENTITLEMENT TO PURCHASE ADDITIONAL COVERAGE UNDER THE REFORMED RCBAP SFIPS

The section of the Manual dealing with policy reformation provides for the belated payment of premiums after a flood loss in order to receive a payout on previously requested coverage. Specifically, the SFIP provides:

> If [FEMA] discover[s] after you have a flood loss that your premium payment was not enough to buy the requested amount of coverage, we will send you . . . a bill for the required additional premium for the current and the prior policy terms. If you . . . pay the additional premium within 30 days of the date of our bill, we will reform the policy to increase the amount of coverage to the originally requested amount effective to the beginning of the prior policy term.

44 C.F.R. § 61 app. A(3) (VII)(G)(b)(1). Citing this provision, Plaintiff contends that it should have been afforded the opportunity after its 2012 flood loss to purchase additional coverage under its reformed RCBAP policies through the payment of additional premiums. Specifically, Plaintiff asserts that because it purchased $250,000 of coverage per building under the GP SFIP, and $250,000 per building was the coverage limit under the GP SFIP, Plaintiff, in purchasing coverage under the GP SFIP, requested the "maximum amount of coverage" available. After reformation, therefore, Plaintiff contends it should have been able to pay premiums to secure coverage up to the amount of coverage it had previously requested, the "maximum amount." Under the Reformed RCBAP policies, this would have been up to $1 million, or, alternatively, at least up to a higher amount sufficient to avoid the coinsurance penalties.

As a threshold matter, this Court has already concluded that the coverage Plaintiff requested under the GP form of the SFIP was never "available" to Plaintiff in the first instance. In evaluating this one of Plaintiff's arguments, however, the Court need not rely on its earlier conclusion. Plaintiff makes the frankly incongruous argument that the amount of insurance

coverage it requested was the "maximum amount" in the abstract, not referring to any particular dollar figure. In Plaintiff's parlance "maximum amount" can mean the $250,000 Plaintiff actually sought to purchase before the flood loss, and can mean some number greater than $250,000 after the flood loss and policy reformation. This simply cannot be so. Property owners cannot and do not purchase insurance for abstract relative values, such as "the maximum amount," or "the minimum amount," or "the average amount." Instead, they must request and purchase specific dollar amounts of coverage under specific forms of the SFIP. It may very well be the case that the amount of coverage they select is descriptively "the maximum amount" legally available to them, but this descriptive fact does not transform their purchase of a specific dollar amount of insurance into an abstract relative amount.

In short, Plaintiff completely misreads § 61 app. A(3) (VII)(G)(b)(1) and presents a legally and linguistically illogical argument in support of its position. § 61 app. A(3) (VII)(G)(b)(1) clearly only provides a mechanism for WYO Companies to collect additional premiums from insureds after a flood loss when it has been revealed that the specific dollar amount of insurance the insured requested to purchase before the flood loss requires the payment of more premiums than the insured had theretofore paid. It does not provide a mechanism to purchase additional insurance after a flood loss.

VII. SUPPLEMENTAL JURISDICITION

Because federal jurisdiction in this case is based solely upon the claims of Plaintiff, an insured, against Standard, a WYO Company, pursuant to 42 U.S.C. § 4072, and because this Court, for the reasons stated above, has dismissed all claims in the Second Amended Complaint against

Standard, the only basis for this Court's jurisdiction over Plaintiff's remaining claims is supplemental jurisdiction under 28 U.S.C. § 1367. 28 U.S.C. § 1367(c)(3) permits the district court, within its discretion, to decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." Indeed, the Third Circuit has used even stronger language to describe the court's obligations under the provision. "[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (citing *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277 (3d Cir. 1993); *Lovell Mfg. v. Export–Import Bank of the United States,* 843 F.2d 725 (3d Cir. 1988)).[4]

In light of the relatively early stage of proceedings before this Court, the fact that all of the remaining counts of the Second Amended Complaint concern matters of New Jersey state law, and the fact that at least one of the remaining defendants is a citizen of the State of New Jersey, it is appropriate for this Court to decline to exercise supplemental jurisdiction over the Amended Complaint. To this point, the Court's consideration of this case has been strictly limited to the conduct of Defendant Standard. Indeed, the majority of the claims against the remaining defendants, and two of the three remaining defendants themselves, were only added to this action

---

[4] *See also Growth Horizons,* 983 F.2d at 1284-85 (quoting David D. Siegel, *Practice Commentary,* appended to 28 U.S.C.A. § 1367) ("Whether a dismissal of the touchstone claim should bring about a dismissal ... of the dependent claim for want of supplemental jurisdiction should hinge on the moment within the litigation when the dismissal of the touchstone claim takes place and on the other surrounding circumstances.... [I]f the dismissal of the main claim occurs late in the action, . . . knocking [the dependent claims] down with a belated rejection of supplemental jurisdiction may not be fair.").

with the filing of the Second Amended Complaint shortly before the present Motion. Plaintiff's New Jersey Consumer Fraud Act and common law claims against the remaining defendants are best resolved by the courts of the State of New Jersey. In accordance with my findings above, I dismiss Plaintiff's state law claims against the remaining defendants (the Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Causes of Action in the Second Amended Complaint) without prejudice and toll the period of limitations for the dismissed state law claims for a period of 30 days, pursuant to 28 U.S.C. § 1367(d).

CONCLUSION

For the foregoing reasons, this Court concludes that, under the National Flood Insurance Program ("NFIP") (i) "residential" means designed for principal use as a dwelling place, (ii) "maximum amount of insurance coverage available" means the maximum amount of insurance coverage legally available to a property owner before the occurrence of a flood-related loss, and (iii) no provision of the NFIP allows for the purchase of additional insurance coverage after a flood loss. Accordingly, the Court grants Standard's Motion and dismisses all claims against it (the Second, Third, and Fourth Causes of Action in the Second Amended Complaint) with prejudice. The Cross-Motions for Summary Judgment of Plaintiff and Chernoff, joined by Albert J. Dweck and the Residences at Bay Point, LLC, are denied as moot. There being no further independent basis for federal jurisdiction in this case, the Court exercises its discretion under 28 U.S.C. § 1367(c)(3) and dismisses the remainder of the state law claims in the Second Amended Complaint without prejudice and tolls the period of limitations for the dismissed state law claims for a period of 30 days, pursuant to 28 U.S.C. § 1367(d).

An appropriate Order shall follow.


Dated:     8/28/2014                                         /s/ Freda L. Wolfson
The Honorable Freda L. Wolfson<br/>United States District Judge